```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                             :    CRIMINAL ACTION
          v.                 :    NO. 21-cr-200
                             :
RAPHAEL ROSS                 :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          NOVEMBER 16, 2022

      Presently before the Court is Defendant Raphael Ross' motion to suppress evidence. On August 10, 2022, the Court held a suppression hearing at which Officers Fulcher, Foreman, and Smart testified for the government, and Ross and his partner at the time of the arrest, Harrington, testified on Ross' behalf. For the reasons discussed below, the Court will deny the motion to suppress.[1]

**I.   Findings of Fact**

      Ross seeks to suppress all physical evidence seized from his car (a handgun and drugs) on January 15, 2021 when he was stopped by Officers Smart and Foreman for having overly-tinted windows.

      Officers Smart and Foreman had been deployed as part of a special mission in a high-crime area in the Grays Ferry

---

[1]    This memorandum constitutes the Court's findings of facts and conclusions of law.

neighborhood of Philadelphia where there had been recent shootings and drug activities. Officer Foreman has participated in at least a hundred arrests involving firearms or drugs. Based on her experience with traffic stops, she is familiar with areas where individuals may conceal firearms, drugs, or contraband within vehicles. Officer Smart has received training from the Montgomery County Police Academy about, and gained knowledge from his own experiences in, recognizing abnormal behaviors during a traffic stop. He has had personal experiences where contraband such as firearms was hidden in vehicles.

Officers Smart and Foreman often investigate the background of the individuals they have pulled over by conducting criminal history checks or consulting their mapping and analysis programs to get a sense of the individual and determine appropriate safety measures, such as calling for backup.

When pulling Ross over on January 15, 2021, the officers could tell that his windows were illegally tinted because when the car drove past traffic lights or streetlights, they could not see the silhouettes of individuals inside the car.

After stopping Ross' car, the officers ran a check on the license plate of the vehicle and learned that it was registered to Raphael Ross. Officer Smart then approached Ross' vehicle on the driver side while Officer Foreman approached from the passenger side.

Upon request, Ross produced expired insurance and vehicle registration cards. When asked whether he had a driver's license, Ross claimed he had left it at the house. Officer Smart explained that they stopped Ross because of the excessive window tint. During this initial discussion, both officers observed in Ross signs of anxiety and nervousness including shaking hands, stammering voice, quivering lips, heavy breathing, and a refusal to make eye contact. Officer Foreman testified that Ross was "in the top five of how nervous" someone could be. Ross testified that he was freezing given that all four windows were down, he was not wearing a jacket, and he was only 150 pounds.

Officer Smart engaged in some small talk with Ross. Observing that he had a Rolex watch, Officer Smart asked him where he worked, to which Ross answered that he owned a home health aide business. Officer Smart testified that he did this to "calm [Ross] down" and "find a common ground of conversation."

According to the officers, Ross started to fumble and rummage around the middle of the cabin and picked up his jacket and placed it over the center console. Ross continued to make such movements throughout the encounter. Ross claims that he was looking for his driver's license in his jacket, although he had already told the officers that he had left it at home. The officers testified that it did not look like Ross was actually

looking for anything in the jacket but was instead simply moving it around in an odd way.

Officer Smart returned to the patrol car to determine whether, inter alia, Ross had a valid driver's license. Meanwhile Officer Foreman moved to the driver's side window to continue engaging with Ross. The computer system in the patrol car informed Officer Smart that "Raphael Ross": (1) had a valid driver's license; and (2) was a federal convict on probation. Officer Smart also checked Ross' criminal history for any outstanding warrants. To obtain a picture of Ross to confirm that the individual in the vehicle was Ross, Officer Smart checked the police database for mugshots. Officer Smart found six mugshots of Ross, thus verifying his identity.

Through these checks, Officer Smart discovered that Ross had been in prison for a May 2018 firearm offense. Officer Smart knew one of the arresting officers, Michael Fulcher, and called him at home. Officer Fulcher told Officer Smart that Ross fought the police officers during his May 2018 arrest for firearm possession after being pulled over in his vehicle and suggested Officer Smart call for backup. Out of concern for himself and Officer Foreman, Officer Smart then called for backup.

Officer Smart's querying of the databases in the patrol car and call to Officer Fulcher lasted about five to seven minutes according to the officers. Ross estimated that it took Officer

Smart ten to fifteen minutes to conduct the checks from his patrol car.

According to Officer Foreman, while Officer Smart was back in the patrol car, Ross continued to avoid eye contact and to shake, stammer, and breathe heavily while reaching around the center console with his jacket. Officer Foreman asked Ross to keep his hands on the steering wheel, which he initially did, but then he began reaching around again. At one point, Ross tried to open his door and hit Officer Foreman in the leg, who immediately told him to stay in the car.

Officer Foreman then signaled to Officer Smart by looking in his direction and nodding her head, indicating that she needed Officer Smart to return. Officer Foreman did this because she felt uncomfortable, could not see where Ross was reaching, and had concluded that they needed to remove Ross from the vehicle for safety reasons. Officer Smart understood Officer Foreman's gesture, and he left the patrol car and joined Officer Foreman at the driver's side of Ross' car.

When Officer Smart returned to the driver's side window, he asked Ross whether there were any "firearms in the vehicle, narcotics, specifically heroin, crack, marijuana, cats and dogs." Ross looked straight ahead, paused, and then "kind of giggled and said no." Officer Smart observed that Ross continued

to appear very nervous and continued to reach towards the center console and move his jacket around.

The backup officer arrived soon thereafter. Officers Smart and Foreman had become sufficiently concerned that Ross might be armed as a result of their observations and interactions with Ross that they then asked Ross to exit the vehicle. Officer Smart frisked Ross. By this point, Officer Smart was not intending to process the tint violation, but instead felt that it was necessary to frisk Ross and the front car area to determine whether Ross was armed. During the frisk, Officer Smart found a large amount of money in Ross' pocket. Ross claimed the money was for his grandfather's funeral.

Based on the foregoing, the officers decided to sweep the front of the vehicle passenger compartment for weapons. Officer Smart observed that the center console had been tampered with, consistent with the secretion of firearms and drugs. Officer Smart shined his flashlight into the dislodged center console and observed a plastic knotted bag stashed therein. Officer Smart did not need to remove any pieces of the center console to view the top of the bag. Officer Foreman also observed that this portion of the console area was manipulated and not fully aligned, and she also saw a white knotted bag inside the gap, which was indicative of drugs to her.

Officers Smart and Foreman directed for Ross to be transferred to the back of a patrol car. Officer Foreman then walked back up to the car's front area and, upon shining a flashlight therein, saw the butt of a black firearm next to the plastic knotted bag in the center console area.

The officers then conducted a more extensive search of the front compartment of the car, removing the top of the center console to retrieve the hidden items. Specifically, the officers recovered a black semi-automatic handgun and a large amount of heroin. They called for the street supervisor to arrive, which took about five minutes. After the street supervisor arrived, the officers placed Ross under arrest, handcuffed him, and retrieved the drugs and gun from Ross' car.

**II.  Standards and Applicable Law**

The stopping of a vehicle and detention of its occupants constitutes a seizure under the Fourth Amendment. United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2006). The Terry reasonable suspicion standard applies to routine traffic stops. United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).

An otherwise valid traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). A traffic stop will normally entail "ordinary inquiries incident

to such a stop," id. at 408, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015).

Moreover, "[t]he Supreme Court has stated that the Fourth Amendment allows an officer to conduct unrelated investigations that do not lengthen a roadside detention." United States v. Garner, 961 F.3d 264, 269 (3d Cir. 2020). "But if these investigations 'measurably extend the duration of the stop,' the seizure becomes unlawful unless otherwise supported by reasonable suspicion or probable cause." Id. (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)). A challenge to the duration of a traffic stop thus requires a court to determine the point at which the traffic stop was or reasonably should have been completed, i.e. the "Rodriguez moment," and then assess whether reasonable suspicion justified any detention beyond that point. Id.

As with a warrantless frisk on the street which is based on a reasonable suspicion that the officer "is dealing with an armed and dangerous individual," Terry v. Ohio, 392 U.S. 1, 27 (1968), law enforcement can similarly conduct the equivalent of a "frisk" of a vehicle based upon the same suspicion of "the possible presence of weapons in the area surrounding the

suspect." Michigan v. Long, 463 U.S. 1032, 1049 (1983).

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Id. (quoting Terry, 392 U.S. at 21 (1968)).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id.

### III. Conclusions of Law

Once Officers Smart and Foreman were conducting the legal traffic stop, they acted consistent with the Fourth Amendment in asking Ross to produce necessary paperwork (a driver's license, proof of insurance, proof of registration) in order to process the ticket for the tint violation. Upon Ross' failure to produce a driver's license, the officers were justified in running records checks to confirm his identity and determine whether or not he had a valid license to drive. Ross' continued detention, while the officers took necessary steps to confirm his identity

and that he had a driver's license, was a necessary part of their processing of the traffic stop and did not trigger any concerns, including a "Rodriguez moment," under the Fourth Amendment.

Officer Smart's phone call to Officer Fulcher, was a "negligibly burdensome precautio[n] in order to complete [the] mission safely" and "attend to related safety concerns," and did not unduly extend the traffic stop or the defendant's detention during the processing of the tint violation. Rodriguez, 575 U.S. at 354; see also Mosley, 454 F.3d at 264 (criminal history check permissible); United States v. Frierson, 611 F. App'x 82, 85-86 (3d Cir. 2015) (same).

The relevant constitutional moment of analysis is the point at which Officers Smart and Foreman decided to frisk Ross and the front area of his vehicle, not as part of the traffic stop, but out of a concern for their safety. Rodriguez, 575 U.S. at 356.

The officers' decision to frisk Ross and the front of his car was consistent with the Fourth Amendment because it was based on reasonable suspicion that Ross was armed or might have a firearm within reach. Long, 463 U.S. at 1045-50.

The factors giving rise to the officers' reasonable suspicion that Ross might be armed or could reach a firearm included:

      a.   Ross' extreme nervous behavior upon their initial encounter with him, including that his hands were shaking when he handed over his registration and expired insurance card, and that he was not making eye contact with the officers;

      b.   Ross' repeated reaching for his jacket and moving it towards the center console of the car, even after he had told Officer Smart that he left his license at the house, and in a manner that suggested to the officers that he was reaching for or trying to conceal something because he was not actually checking the pockets of the jacket;

      c.   Ross' reaching towards areas of the car Officer Foreman could not see, followed by his failure to comply with Officer Foreman's instruction to keep his hands on the steering wheel and instead continuing to reach around the car and shift the jacket;

      d.   Ross' effort to open the car door when Officer Foreman was standing at the driver's window, requiring her to shift her body to secure the door shut;

      e.   Ross' failure to make eye contact with the officers, including when Officer Smart returned to the driver's side window;

      f.   Officer Smart's learning that Ross had a criminal history that involved a most recent arrest for possessing a firearm in connection with a vehicle stop, and learning from his

colleague that Ross had resisted arrest during that encounter; and

    g. The fact that Officers Foreman and Smart both had personal experiences with vehicle stops in which individuals concealed contraband, including firearms, in areas such as the center console, and that both officers learned through training and experience that behaviors Ross was exhibiting -- nervousness, repeated reaching towards areas of the car, and failure to make eye contact -- can be indicative of concealment of contraband.

Officers Smart and Foreman, during their frisk of the front area of Ross' car, saw a white knotted baggie and the butt of a gun in plain sight when they shone a light towards the console area and were justified in further investigating those items by lifting the top of the console to fully view and then seize the items. Long, 463 U.S. at 1050 ("If, while conducting a legitimate Terry search of the interior of the automobile, the officer should . . . discover contraband . . . he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."). Once the officers saw the white knotted baggie which they recognized as narcotics and a gun butt, they had probable cause to search the car, without a warrant, under the well-established Carroll doctrine. United States v. Carroll, 267 U.S. 132 (1925); accord

Arizona v. Gant, 556 U.S. 332, 347 (2009) (recognizing the longstanding "automobile exception" that permits law enforcement to search a vehicle without a warrant so long as there is "probable cause to believe [t]he vehicle contains evidence of criminal activity").

**IV. Conclusion**

Because Officers Smart and Foreman's stop and frisk of Ross and his vehicle were within Constitutional parameters, the Court will deny Ross' motion to suppress evidence.

An appropriate order follows.